# In the United States Court of Federal Claims

No. 18-1922C
(Filed under Seal: November 19, 2021)
Reissued: December 7, 2021[1]

```
*************************************
                                    *
DAIRYLAND POWER COOPERATIVE,        *
                                    *
                  Plaintiff,        *
                                    *
        v.                          *
                                    *
THE UNITED STATES,                  *
                                    *
                  Defendant.        *
                                    *
*************************************
```

## OPINION AND ORDER

**DAMICH**, Senior Judge

This case is before the Court after a 5-day trial on damages.  Plaintiff Dairyland Power Cooperative ("Dairyland"), an electric generation and transmission cooperative, seeks to recover $25,634,658 in damages for contractual breach from the Defendant (the United States Government – "Government") incurred between January 1, 2013 and December 31, 2018.[2]  This is the third round ("Round 3") of damages litigation concerning Spent Nuclear Fuel liabilities, which must be filed every six years.

Previously, the parties both moved for Summary Judgment, and the Court granted the Government's motion and denied Dairyland's, reducing Dairyland's original claim from $54,391,039 to the current disputed amount, $25,372,186. Of this sum, the Government contests $14,247,848 and concedes the remainder.

---

[1] No redactions were forthcoming from the parties.

[2] Round 1, determining Dairyland's damages incurred through December 31, 2006, awarded Dairyland $37,685,902 after trial.  *Dairyland Power Coop. v. United States*, 90 Fed. Cl. 615 (2009); *Dairyland Power Coop. v. United States*, 645 F.3d 1363 (2011); *Dairyland Power Coop. v. United States*, 104 Fed. Cl. 400 (2012).  Round 2, determining Dairyland's damages incurred between January 1, 2007 and December 31, 2012, ended in a settlement between the parties for $73.5 million.

Dairyland generally seeks to recover their claimed direct and indirect costs of running the LaCrosse Boiling Water Nuclear Reactor facility ("LACBWR") and Independent Spent Fuel Storage Installation ("ISFSI"), which holds Dairyland's Spent Nuclear Fuel ("SNF"). Both LACBWR and the ISFSI are located in Genoa, Wisconsin.

Comprising its damages claim, Dairyland seeks (1) LACBWR Operations costs ($5.14 million), (2) ISFSI monitoring and maintenance costs ($13.91 million), (3) the costs of a Special Early Retirement Plan ("SERP") offered to LACBWR union employees near retirement ($2.24 million), (4) insurance and taxes ($1.88 million), (5) the "indirect" general and administrative costs underlying LACBWR and the ISFSI ($2.19 million) and (6) the remaining minor costs for "Private Fuel Storage," an abandoned contingency plan for storing nuclear fuel in lieu of the Government's breach ($1,301).[3]

Responding to these claimed damages, the Government proposes a total of $14,247,848 in deductions. The Government does not challenge the fundamental existence of Dairyland's costs, but nonetheless proposes deductions for costs allegedly reflecting (A) actual decommissioning costs, (B) costs not caused by the Government's breach (or at least not foreseeable at the time), (C) costs reflecting "claim support deficiencies" and (D) excess general and administrative costs stemming from a questionable calculation.

The 5-day damages trial was held from June 8-14, 2021. The Court heard from 9 witnesses. For the reasons presented, the Court awards Dairyland $23,153,322.84. The Court has reduced the amount of damages claimed because of credible evidence that $2,218,863.16 of Dairyland's claim is tied to decommissioning.

## I.     Trial Testimony

Over the course of the trial, this Court heard testimony from a series of Dairyland witnesses: Roger Christians (plant manager of LACBWR), Lane Peters (manager of the Genoa site), Robert Palmberg (a longtime Dairyland executive and VP), Keith Stubbendick (Director of Accounting and Controller). April Wehling (Chief Strategy Officer) and Dr. Cheryl Olson (ISFSI manager, whose work included LACBWR).

This Court also heard testimony from three expert witnesses, Mary Karen Wills for Dairyland, and Gregory Maret and Robert Peterson for the Government.[4] Ms. Wills was admitted as an expert in financial accounting, cost and managerial accounting and breach of

---

[3] This Court found in 2009 that PFS reflected Dairyland mitigation against the Government's breach – but-for that breach, no alternative means of storing SNF outside the LACBWR plant would have been necessary. *See Dairyland Power Coop. v. United States*, 90 Fed. Cl. 615, 637 (2009). Under direct examination at trial, Mr. Palmberg alleged, "We had not yet made the decision to unwind PFS, so there were small bills that came in just to keep the operation going." Tr. 285 (Palmberg). The Government contests these costs in a footnote of its brief (*see* ECF No. 126 at 24, n.8) but failed to challenge them at trial – therefore, these costs are awarded to Dairyland.

[4] Dairyland filed motions *in limine* to exclude the testimony of Mr. Maret and Mr. Peterson. Both motions were denied by the Court. *See* ECF No. 100; ECF No. 102.

contract damages (allowed to offer an expert opinion but not legal opinion).  Mr. Maret was admitted as an expert in nuclear power plant operations and management, the management of SNF, decommissioning and regulatory compliance.  Mr. Peterson was admitted as an expert in damages in cost and pricing, construction contracts, Government contracts, financial analysis and damages analysis.

## II.   Discussion of Damages Calculations

In addition to the $25,372,186 claimed by Dairyland in this litigation for costs related to LACBWR, Dairyland originally claimed an additional $28,756,381 in decommissioning costs, purportedly distinguished from LACBWR operations.   The Government moved for partial summary judgment, requesting an offset in the amount of the growth of Dairyland's Nuclear Decommissioning Trust (NDT) ($40,623,353), against Dairyland's claimed $28,756,381 in claimed decommissioning costs.

This Court granted the Government's motion, finding that "Dairyland was required to assure funding for decommissioning and did this by "set[ting] aside the NDT funds to cover it future decommissioning liability."  *See* ECF No. 99 at 1 (citing ECF No. 50).  With the $40,623,353 offset absorbing Dairyland's claimed $28,756,381 in decommissioning costs, if the Government is able to additionally construe Dairyland's claimed LACBWR costs as "decommissioning," these costs are likewise subject to offset from the remaining NDT funds rather than recoverable as damages.

Thus, the dispute at the core of this litigation comprises Government allegations that Dairyland's claimed LACBWR costs are actually decommissioning costs, which, if so, would prevent Dairyland from recovering such costs as damages.

## A. Decommissioning Deductions: SAFSTOR/LACBWR Operations[5]

In the late 1980's and early 1990's, it became apparent that DOE was not going to begin retrieving SNF by 1998 as required under the Standard Contract signed between Dairyland and the Government for the disposal of SNF.  *See Dairyland Power Coop. v. United States*, 90 Fed. Cl. 615-16, 619-21 (2009).  Dairyland recognized its duty to mitigate, and that it would not be able to decommission the LACBWR facility as long as the SNF was stored in LACBWR's wet pool.  *Id.* at 649.  Dairyland therefore pursued alternative methods of removing the SNF to enable decommissioning of the LACBWR plant.  *Id.*  Finally, beginning in 2007, technological progress enabled Dairyland to construct an ISFSI, to which it moved the SNF from the wet pool – this work was completed in 2012.  *Id*. at 623, 637; Tr. 40-41 (Christians).

Irrespective of the removal of the SNF, the LACBWR plant remained in SAFSTOR[6] mode afterwards – it was necessary to keep the plant running operationally because it contained

---

[5] The Government proposed deductions from Dairyland's P-Code costs spanning (1) alleged "Claim Support Deficiencies," (2) Site Security, (3) an NRC Investigation and (4) alleged decommissioning costs.  *See* ECF No. 110 at 6. This subsection only addresses proposed deductions falling into the last of these categories.  *See id.*

[6] The parties dispute the meaning of SAFSTOR.  *See* discussion below.

high radioactivity and radioactive waste such as resins. *See* Tr. 35 (Christians). Leading up to the period covered by Round 3 (2013-18), with the plant under SAFSTOR, LACBWR employees were overwhelmingly restricted (on both practical and regulatory grounds) to mere "limited dismantlement" activities, removing only "minor systems" "just to give the guys something to do." Tr. 42 (Christians); *see also* 10 C.F.R. §50.59 (regulations requiring Nuclear Regulatory Commission ("NRC") pre-approval of dismantlement of equipment or systems necessary to run a nuclear power plant)

Dairyland represents that during this Round (2013-18), they distinguished "decommissioning" costs from the costs of continuing to run the LACBWR facility, with such costs recorded and tracked through specific "P-Codes" within Dairyland's accounting system: putative LACBWR "Corporate Support" costs were assigned to P31730, and LACBWR plant costs were assigned to P30501 and P30632. The Government's proposed "decommissioning" deductions from these three categories comprise a $10,078 deduction from P31730 (the entire sum claimed by Dairyland), a $3,370,096 deduction from P30501 and $1,209,921 deduction from P30632.

### 1. The Definition of "SAFSTOR"

The parties agree that "SAFSTOR" is a term connoting the operational status of the LACBWR facility.

But, on the one hand, the Government contends that the plant's SAFSTOR status definitionally triggers a finding that activities inside the plant constituted "decommissioning." *See* ECF No. 126 at 1 (". . . SAFSTOR is a decommissioning construct."). The Government thereby asserts that almost all[7] of the P-Code costs relating to LACBWR operations under SAFSTOR are "decommissioning" costs, and must be paid out of the NDT rather than recoverable as damages. *See* ECF No. 126 at 6-8.

On the other hand, Dairyland proposes that whether LACBWR was in a "decommissioning" state depends on actual "dismantlement" of the LACBWR facility – more precisely, whether LACBWR had moved beyond "limited dismantlement," meaning the removal of minor systems unnecessary for operating the plant. *See* ECF No. 125 at 28; Tr. 36 (Christians)[8]; *see also* 10 C.F.R. §50.59 (regulations requiring "answer[ing] a series of questions before we could remove anything.").

This Court declines to make a finding that SAFSTOR operational status itself triggers "decommissioning" findings with respect to LACBWR plant activities. This decision is based on two considerations:

---

[7] *See* Tr. 794 (Maret suggesting that Dairyland's P-Code charges reflected "close[] to eighty to ninety percent" decommissioning activities, based on a review of unidentified "listings").

[8] "We had to do a 10 CFR 50.59 evaluation of anything we took out of the plant to see if it was going to affect the operation of SAFSTOR, to see how much radiation we anticipated someone would get. So we had to answer a series of questions before we could remove anything." Tr. 36 (Christians).

First, the two sides differ over an NRC definition of "SAFSTOR" retrieved from the NRC website (PX 704) which states:

> Under SAFSTOR, often considered deferred dismantling, a nuclear facility is maintained and monitored in a condition that allows the radioactivity to decay. Afterwards, the plant is dismantled and the property decontaminated." *See* PX 704; *see also* Tr. 790 (Maret).

Leaving aside the fact that this NRC was published online in 2018, Dairyland introduced PX 704 to impeach the Government's expert witness's (Mr. Maret's) contention that SAFSTOR equated to "decommissioning," and both sides argued that PX 704 supported their position. *See, e.g.*, Tr. 787-791 (Maret). This apparent NRC definition is inconclusive for the purposes of this case.

Second, the Government's position – that SAFSTOR costs are not recoverable as damages (and should be paid out of the NDT) – seemingly conflicts with this Court's Round 1 decision (affirmed by the Federal Circuit) awarding damages for running the LACBWR facility when the facility was in SAFSTOR mode, without applying funds from the NDT. *See Dairyland Power Coop. v. U.S.,* 90 Fed. Cl. at 636, 652 n. 34, *aff'd in part*, 645 F.3d 1363 (Fed Cir. 2011).

The Government tries to distinguish Round 1 SAFSTOR from Round 3 SAFSTOR, arguing that the removal of SNF from the LACBWR plant by 2013 (the beginning of Round 3) supports the idea that SAFSTOR mode, *post-SNF removal*, renders LACBWR operational costs "decommissioning" costs. ECF No. 126 at 1, 7, 16. However, both sides stipulated at trial that following removal of the SNF, LACBWR needed to be maintained because of residual radioactive material and radioactivity inside (e.g. resins). *See, e.g.,* Tr. at 34 (Chrisitans); Tr. 692 (Maret). Closure of the plant was long delayed by the Government's breach, and these delays impacted operations inside the plant independent of management of the SNF. Regulations governing employees' activities inside the plant under "SAFSTOR" constraining the removal of equipment. 10 C.F.R. §50.59. Witnesses describe the LACBWR facility under SAFSTOR as necessarily stuck in a functional holding pattern, administratively and mechanically. *See* Tr. 36, 42 (Christians), 55 (Peters), 425-26 (Stubbendick). Thus, immediately before Round 3, only "non-essential equipment" or "minor systems" had been moved out of LACBWR, i.e., systems not needed for actually running the facility, and which were not radioactive or did not help to deal with radioactivity, "just to give the guys something to do." Tr. 34-36, 42 (Christians). This set the stage for the parties to present arguments about whether Round 3 costs corresponded to continued LACBWR operations or to decommissioning activities.

Because the Court declines to make a finding that SAFSTOR operational status itself renders LACBWR operational costs "decommissioning" costs, the Court next addresses the parties' substantive evidence and arguments concerning whether Dairyland's claimed P31730, P30501 and P30632 costs constitute "decommissioning" costs.

## 2. P31730

Dairyland seeks to recover $10,078 in damages based on LACBWR Corporate Support costs recorded by Dairyland under P31730 between January 2017 and September 2018.

The parties agree that these costs transpired, and do not generally dispute the foreseeability of LACBWR costs incurred while decommissioning was delayed by the Government's partial breach. But the question of causation remains, which is a question of fact. The Government challenges Dairyland's claimed P31730 costs, proposing that these are "decommissioning" costs which must be paid out of the NDT.

The Government's main argument relies on an inference that Dairyland's October 2015 agreement with LaCrosse Solutions represents a deadline or trigger for classifying costs as "decommissioning." In October 2015, Dairyland negotiated a fixed-price contract with LaCrosse Solutions ("LaCrosse"). *See* JX 49. LaCrosse Solutions began work on site at LACBWR in June 2016. Tr. at 136 (Olson). Under the terms of the agreement, LaCrosse assumed the nuclear license for LACBWR, and Dairyland became a temporary subcontractor to LaCrosse. Tr. at 288, 333-35 (Palmberg). Thus, LaCrosse assumed responsibility for coordinating with the NRC (Tr. at 333-35 (Palmberg)), while Dairyland continued to pay the NRC fees. Tr. at 289 (Palmberg).

The Government appears to deduct all LACBWR costs claimed as damages following the involvement of LaCrosse.[9] The Government invokes this position with respect to P31730 costs based on a Dairyland "Project Tracking System" document titling P31730 as "Corporate Support of LACBWR plant and *Energy Solutions/LaCrosse Solutions*" (emphasis added). *See* DX 460; Tr. 501-03 (Wehling), 869-70 (Peterson). In short, the Government implies that "because this cost says 'LaCrosse', the cost reflects decommissioning." *See* ECF No. 126 at 17-18[10]; *see also* Tr. 870 (Peterson). However, the Government barely mentions "LaCrosse Solutions" or "Energy Solutions" in its briefs and fails to hash out arguments that these represent a trigger or deadline for identifying "decommissioning" costs.

The Court finds that, without more,[11] the title of P31730 as listed in a single 2019 Dairyland document does not tie P31730 costs to decommissioning. Dairyland witnesses testified that LACBWR operations in practice did not change because of the LaCrosse agreement in October 2015, reflecting "exactly the same functions" before and afterwards. Tr. 290 (Palmberg). While LaCrosse was working on-site at LACBWR, Dairyland continued to incur "insurance costs, security costs, NRC fees, staff costs [and] payroll-type costs related to LACBWR." Tr. 60 (Peters). At trial, Dr. Olson reviewed a Dairyland invoice in which every

---

[9] It is implicitly apparent that the Government regards the October 2015 Dairyland agreement with LaCrosse as a deadline after which LACBWR facility costs – even including toilet paper – reflect "decommissioning." *See* Peterson Expert Report attachment 9-b.

[10] "The decommissioning nature of the tasks that Dairyland contends were SAFSTOR was highlighted by the testimony about the project codes that Dairyland used to track various activities . . . Yet a third example is Dairyland project code P31730, which captures costs for activities performed by corporate staff in support of the LaCrosse *Solutions* decommissioning activities." ECF No. 126 at 17-18.

[11] Mr. Peterson's P31730 demonstrative at trial cited spreadsheets prepared by ABZ. The spreadsheets do not include, e.g., P31730 invoice descriptions expressly stating "decom" – they merely show that ABZ ascribed P31730 to decommissioning. Thus, these ABZ P31730 classifications amount to inadmissible hearsay.

single line item included "LaCrosse," observing, "I don't see that there's any decommissioning activities on this invoice." Tr. 162 (Olson); JX 28. The Government did not challenge Dr. Olson's assertion that "LaCrosse" does not signify "decommissioning."[12]

The Court finds that "LaCrosse" appearing in the title of P31730 insufficiently supports the Government's argument linking P31730 to "decommissioning." Therefore, Dairyland recovers the P31730 costs – $10,078 – as damages.

### 3. P30501 and P30632

The parties do not dispute that costs charged to P30501 and P30632 in fact transpired, but the Government argues that many of the charges should be deducted from Dairyland's claimed damages because, purportedly, they actually represent decommissioning costs.

At trial, Dairyland represented that P30501 and P30632 were used "interchangeably" to track costs related to routine upkeep and maintenance of LACBWR. Tr. 180 (Olson). Both codes spanned "pest control, electricity bills, roof repair, HVAC, and fire inspections." *See* Tr. 147 (Olson). Mr. Peters testified that the codes spanned insurance costs, security costs, staff costs and payroll for LACBWR. Tr. 60 (Peters). Dairyland also highlights the credibility of their own bookkeeping.[13]

The Government divided its witness testimony between qualitative and quantitative analysis – respectively between Mr. Maret and Mr. Peterson. However, the Court did not find Mr. Maret credible. Mr. Maret based his review on uncertain (undisclosed and never-produced) "listings" whose provenance he could not explain. Tr. 777-78, 785 (Maret). In addition, Mr. Maret conceded that this "listings" review included only "two or three" NRC invoices, indicating that he did not review invoices reflecting non-NRC costs. Tr. 779 (Maret). In its post-trial brief, the Government implausibly suggests that "the court already rejected . . . argument[s about Mr. Maret's evidence] at trial, and Dairyland should not be able to revive [such arguments] now" (citing Tr. 1011). ECF No. 132 at 13. In fact, the trial record reflects that the Court expressly declined to strike Mr. Maret's testimony, relying instead on Dairyland's cross-examination to

---

[12] The Government did cross-examine Dr. Olson about a different NRC invoice. Tr. 230-34 (Olson); JX 27. However, the Government's question to Dr. Olson concerned a line item which explicitly stated "decom," which is distinct from Dr. Olson's JX 28 inference that not a single "LaCrosse" line item equates to a "decommissioning" expense.

[13] "Dairyland's accounting system was subjected to annual audits, both internal and external. Tr. 473-74 (Wehling). The external audit is performed by Deloitte & Touche. Tr. 474 (Wehling). Because of the notable liabilities associated with being in the nuclear business, Dairyland's nuclear operations attracted a heightened level of attention from Deloitte. Tr. 356-57 (Stubbendick). This extra attention could include a sampling of different transactions, either at a higher-level basis or drilling down to the account number or account level. Tr. 358 (Stubbendick). Mr. Stubbendick stated that Dairyland never received anything but a clean opinion from its outside auditor during his time as controller. Tr. 356. Ms. Wehling testified that Dairyland's cost tracking system was never found to be inadequate during her tenure as controller, and that Dairyland received a successful audit report each of those years. Tr. 483." ECF No. 125 at 25.

highlight its substantive and procedural evidentiary flaws.  *See* Tr. 1010-11, *contra* ECF No. 132 at 13 (citing Tr. 1011).

Dr. Olson was in charge of allocating costs to the P-Codes.  *See* Tr. 145 (Olson).  With respect to P30632, Mr. Maret contended that his opinion that P30632 reflects decommissioning costs was supported by Dr. Olson's testimony (*see* Tr. 735-37 (Maret)), but the Court finds that Dr. Olson made no express statements at trial linking P30632 to "decommissioning."  However, the Government's cross-examination of Dr. Olson established that P30501 was sometimes used for decommissioning costs.  Ms. Wills testified that pre-2014 P30501 charges were not included in Dairyland's claimed damages because in 2014, P30501 was repurposed so as to no longer correspond to decommissioning.  *See* Tr. 553 (Wills).  However, Dr. Olson conceded that decommissioning costs were sometimes charged to P30501.  *See Tr.* 228-230; 241-242 (Olson).

Mr. Peterson's presentation and testimony about the P-Codes relied on Mr. Maret and ABZ, partially implicating the same substantive and procedural evidentiary concerns mentioned above.[14]  However, Mr. Peterson's presentation and documents carved a path for delineating decommissioning costs erroneously charged to P30501 and P30632. At trial, Mr. Peterson repeatedly cited spreadsheets including "9B" (cataloguing costs charged to P30501) and "9C" (cataloguing costs charged to P30632) which are also listed as footnotes in his demonstrative. These spreadsheets correspond to the Government's proposed "decommissioning" deductions respectively under these two P-Codes.  *See* DX 535, Tr. 919, 926-27 (Peterson).  The spreadsheets include an "invoice description" column.  *See* Tr. 926-27 (Peterson).  A significant proportion of the P30501 invoice descriptions provided in 9B explicitly link Dairyland P30501 costs to decommissioning.  *Id.*  Likewise, a smaller proportion of the P30632 invoice descriptions in 9C link certain P30632 costs to decommissioning.  *See* Tr. 919, 926-27 (Peterson).  When these spreadsheets surfaced at trial with Mr. Peterson on the stand, Dairyland did not contest or question the invoice descriptions.  *Id.*  Also, while the Government's deductions ("adjustments") in these spreadsheets are far more extensive than the entries including invoice descriptions, the Court finds that the Government did not present sufficient evidence to support such further deductions.  *See* Tr. 926-27 (Peterson).[15]

---

[14] Q. And, Mr. Peterson, I just want to clarify. When you say "ABZ," are you talking about Mr. Greg Maret, the technical expert?
A. Yes. I apologize. Mr. Maret worked in conjunction with ABZ. He has a long history with them. I probably am not fully prepared to -- I don't know all the details of their relationship. But I -- I think of them as one and the same, part and parcel, even though I think his technical employer is someone else. Tr. 860 (Peterson).

[15] Q. And most -- for example, if you look back at Appendix 9B to your report, the great majority of those invoice lines are blank, aren't they?
A. Well, for many of these.
Q. Aren't most of them blank? If you would answer my question.
A. I'm trying to give you a complete answer. Most of those lines -- or many of those lines are not things for which we would have invoice. Not everything would have an invoice. There are a lot of labor.
THE COURT: Just answer the question. Pose it again.
Q. Are most -- most of the invoice lines are blank.

The Court accepts the Government's P-code deductions for line entries on spreadsheets 9B and 9C where an express, listed invoice description links the given cost to "decommissioning."

For P30501, the Government proposed $3,370,096 in "decommissioning" deductions, and for P30632, $1,372,892 in decommissioning deductions.

With P30501, the Court accepts $2,075,330 out of the Government's deductions and awards the remaining $1,294,766 to Dairyland as damages. With P30632, the Court accepts $121,809.16 of the Government's deductions and awards the remaining $1,088,111.84 to Dairyland as damages. Thus, in total between P30501 and P30632, the Court grants the Government a total deduction of $2,197,139.16 and awards Dairyland $2,382,877.84 in damages.

## B. Decommissioning Deductions: ISFSI/P10170

### 1. Background

The ISFSI represents Dairyland's storage of Spent Nuclear Fuel (SNF) removed from LACBWR. Dairyland claims these costs as damages arising from the Government's breach.

The Government proposes three categories of deductions from Dairyland's claimed ISFSI-related damages: (1) $3.37 million in deductions for Site Security (*infra*), (2) $307,916 in deductions stemming from alleged claim support deficiencies (*infra*), and (3) deduction of three specific line items totaling $207,384, construed by the Government as decommissioning activities independent of the ISFSI.

This third deduction category – for $207,384 – reflects three costs which the Government challenges: (A) $189,079 related to NRC activities, (B) $12,612 allocated to represent Dr. Olson's labor and (C) a $6,314 bill for the cost of retaining Sargent & Lundy, a firm supporting the ISFSI work.

The costs of Dairyland engaging with the NRC with respect to the ISFSI (P10170) – representing storage of Spent Nuclear Fuel on-site – were foreseeable, caused by the Government's breach and reasonably certain. The government's position with respect to these deductions is that they are "not questioning the ISFSI code, but looking at the charges to make

---

A. I don't know that. I'm looking at 15 lines out of a spreadsheet that has 1590 lines.
Q. Well, you can sift through a copy of your report, as I am now, looking at page after page, and only a few lines have an entry in the invoice description.
A. That would be consistent with the -- either the availability of invoices or the actual type of charge being something that would require an invoice.
Q. Okay. So if you don't have an invoice, how do you go about figuring out the correct bucket to put in one of these charges that we're looking at?
A. You'd have to ask Mr. Maret. Tr. 926-27 (Peterson).

sure that there was no miscoding," that is, activities coded under ISFSI that were actually decommissioning activities.  Tr. 871 (Peterson).

## 2.  ISFSI Cost Deduction for NRC Activities

The Government seeks a $189,079 "actual decommissioning" deduction stemming from "NRC Activities" charged to P10170, apparently on the basis of reviews of certain NRC invoices.

The parties specifically introduced three NRC invoices at trial (JX 26-28).  These NRC invoices include charges to P10170, but also to P30501 and P30632.[16]  Because the Court finds no reliable P10170-equivalent to Mr. Peterson's 9B and 9C spreadsheets (which correspond to P30501 and P30632), the Court's only reasonable alternative is to assess the Government's proposed P10170 deductions from the NRC invoices presented at trial.

The first such NRC invoice, JX 26, represents a $40,339.36 charge to P10170.  JX 26. While the invoice does not include the term "decommissioning," it does list $15,410 in charges corresponding to Dairyland's transfer of its NRC license to LaCrosse Solutions.  Id.  Dr. Olson testified that because the purpose of Dairyland's license transfer was to accelerate decommissioning at the LACBWR site, this charge should have been assigned to a decommissioning code.  See Tr. 164-66 (Olson).

The second NRC invoice presented at trial, JX 27, reflects Dairyland costs charged exclusively to P30501, and these costs are reflected on Mr. Peterson's 9B spreadsheet, on which the Court relied in assessing the Government's proposed P30501 deductions.

The third NRC invoice, JX 28, includes $44,577.78 charged by Dairyland to P30632 and $804 charged to P10170.  JX 28.  Likewise, this Court assesses the Government's proposed deductions under P30632 with respect to Mr. Peterson's 9C spreadsheet rather than this invoice. With respect to the $804 charged to P10170, Dr. Olson testified – unchallenged – that this charge related to the ISFSI, not to LACBWR decommissioning activities.  Tr. 160 (Olson).

Therefore, assessing the Government's proposed P10170 "decommissioning" deductions with reference to these three NRC invoices, the Court recognizes only the $15,410 deduction from JX 26.

The Court finds that the Government did not provide any further credible evidence justifying NRC deductions under P10170.  Responding to Dairyland's contention that Mr. Peterson "offered no analysis or supporting factual information," the Government cites Mr. Peterson's testimony; however, in each case Mr. Peterson deferred to ABZ and/or to Mr. Maret. See Tr. 871, 915, 920-24, 938-41 (Peterson).  As reflected in these extracts, the Court finds that Mr. Peterson's testimony did not provide reliable support for the Government's proposed P10170 "decommissioning" deductions.

---

[16] The P30501 and P30632 charges listed on the three NRC invoices are also listed on Mr. Peterson's 9B and 9C spreadsheets – therefore, these deductions have already been addressed.

The Government also tries to argue its case by asking, how can Dairyland challenge the Government's evidence when the Court has already ruled in favor of the Government's evidentiary methods under *Daubert*? *See* ECF No. 132 at 16-17, citing ECF No. 102. This argument caricatures the Court's *Daubert* ruling. The Court approved of Mr. Peterson's methodology, *anticipating* that Mr. Peterson's review would reflect "supporting documentation, depositions, Round I trial testimony, and cost data in making his findings." ECF No. 102. However, with the exception of the NRC invoices, the Court finds that the Government did not convincingly present such evidence in support of its P10170 decommissioning deductions.

The Court finds that Dairyland attributed $15,410 in decommissioning costs to P10170 and accepts these as deductions from Dairyland's damages. The Court rejects the remaining $173,669 in proposed deductions, which are awarded to Dairyland.

### 3. ISFSI Cost Deduction for Dr. Olson's Labor

Dr. Olson testified at trial that she split her time between P10170/ISFSI and working at the LACBWR plant (i.e. P-codes P30501 and P30632). *See* Tr. 213-16 (Olson).

The Government alleges that Dr. Olson misbilled or misrecorded her hours so that some work ascribed P10170/ISFSI costs was actually related to LACBWR decommissioning; therefore, the Government proposes a deduction from Dairyland's claimed costs billed under P10170/ISFSI. *See* ECF No. 132 at 14-15 (citing Tr. 213-16 (Olson)). Mr. Peterson testified that "[Dr. Olson] indicated she spent a certain amount of time on the dismantlement project and I made adjustment for that." Tr. 968 (Peterson). The Government further alleges that Dr. Olson's testimony directly includes such an admission. *See* ECF No. 132 at 14-15 (citing Tr. 213-16 (Olson)).

However, in fact, Dr. Olson's trial testimony does not include an express admission about misbilling of hours charged to P10170 which should have been instead recorded as LACBWR "decommissioning" costs. *See* Tr. 213-16 (Olson). Dairyland's brief points out that aside from the cited testimony of Dr. Olson, "The only other relevant testimony" was Mr. Peterson's allegation and that actually Dr. Olson "did not testify that 100 percent of her hours were reported against the ISFSI project code." ECF No. 125 at 31-32. The Court agrees.

In light of this, the Court rejects the Government's proposed $12,612 deduction from Dairyland's claimed P10170 costs vis-à-vis Dr. Olson's labor hours, and Dairyland is awarded those costs.

### 4. ISFSI Cost Deduction: Sargent & Lundy Invoice

Sargent & Lundy ("S&L") is an engineering firm that worked on the LACBWR site. Tr. 169 (Olson). This work was both physical and bureaucratic. *Id.* Some but not all of the S&L work involved decommissioning. *Id.* Two S&L invoices were charged to P10170/ISFSI on March 16, 2015 – one of these concerned, putatively, "Staff Augmentation Services: quality assurance support of LACBWR *decommissioning planning*" (emphasis added) for $6,314. JX 30.

11

The Government takes the straightforward position that the Court "should rely on the description contained in the exhibit" and deduct the invoice amount from Dairyland's damages. ECF No. 132 at 18. Dairyland argues that the Court's decision with respect to this deduction should not turn on the plain text of the invoice,[17] but rather on Dr. Olson's testimony. Dr. Olson's testimony at trial recalled how Dairyland "received a notice of violation from the NRC for the ISFSI," and that this was "traumatic" for Dairyland. ECF No. 125 (citing Tr. at 243 (Olson)). Dr. Olson further testified that S&L's "sole work that month" concerned the NRC investigation and that they "would not have been doing anything related to decommissioning at that time." Tr. 173, 243-44 (Olson). However, as Dairyland also acknowledges, Dr. Olson was also centrally involved in signing off on the invoices, including those corresponding to S&L. ECF No. 125 at 35.

The Court prefers to rely on Dairyland's 2015 original written representations concerning S&L's work: Given the plain text of Dairyland's description of the activities corresponding to the invoice, the Court accepts the Government's $6,314 deduction from Dairyland's damages.

## C. Nuclear Insurance Costs

This Court has already ruled that but-for the Government's breach, decommissioning and removal of the SNF would have been complete as of 2005. ECF No. 108. Dairyland's need for nuclear insurance – mandated by the NRC – depended on its presence in the nuclear business. Dairyland's nuclear insurance premiums remained essentially constant between 2013 and 2017, then dropped significantly in 2018 after Dairyland requested and received a reduction in its premiums from the NRC. PX 493 at 36; *see also* Tr. 128 (Peters).

Dairyland's arguments for recovery of its full insurance costs highlights regulatory ties between Dairyland and the NRC. Dairyland's insurance policies reflected NRC regulations and Dairyland's NRC-administered nuclear license, which spanned the entire Genoa site.[18] *See* Tr. 167-68 (Olson). Dairyland argues that given this Court's finding that decommissioning would have been complete by 2005 if not for the Government's breach, Dairyland would have been "out of the nuclear business" thereafter and would have paid *zero* nuclear insurance premiums during the 2013-18 period. *See* Tr. 60 (Peters); ECF No. 108.

Dairyland also argues that its nuclear insurance policies and premiums did not hinge on "decommissioning" because the insurance premiums reached their high point at the time of construction of the ISFSI and the transfer of SNF from the LACBWR facility into the ISFSI. *See* Tr. 577, 1035-36 (Wills). This, Dairyland contends, indicates that the insurance (and its costs) reflected the physical presence of SNF, not the state of decommissioning of LACBWR. *Id.*

---

[17] "Dairyland acknowledges the service description states: 'Staff augmentation services: quality assurance support of LACBWR decommissioning planning.'" ECF No. 125 at 34-35.

[18] The "Genoa site" is Dairyland's property in Genoa, WI, and includes all of the LACBWR buildings. See DX 536, Tr. 103 (Peters). "LACBWR" equals the ISFSI, former plant, administration building, crib house, and any other nuclear-related structure that used to exist. *See* ECF No. 125 at 21-22, citing DX 536; Tr. 130 (Peters); Tr. 244 (Olson); Tr. 340 (Palmberg), Tr. 463 (Wehling).

The Government makes three arguments drawing putative links between Dairyland's nuclear insurance policies and its efforts to decommission LACBWR. First, the Government argues that Dairyland's NRC insurance policies are linked to "decommissioning" by contending that "Dairyland was required to maintain this insurance coverage for LACBWR, not the ISFSI, and it is therefore related to decommissioning LACBWR." ECF No. 126 at 23. However, trial testimony showed that (A) Dairyland's insurance policies reflected NRC regulations and Dairyland's NRC-administered nuclear license, spanning the entire Genoa site, and (B) that the insurance policies principally a reflection of the presence of SNF on site. *See* Tr. 167-68 (Olson); Tr. 577 (Wills). The Court found Ms. Wills especially credible.

Second, the Government argues that because Dairyland requested and received an exemption from the NRC to lower Dairyland's nuclear liability insurance premiums, this ties the insurance to decommissioning. ECF No. 126 at 24. However, this Court has already ruled that but-for the Government's breach, LACBWR would have been decommissioned in 2005. *See* ECF No. 108. Therefore, the Court finds that it would not be reasonable to tie Dairyland's nuclear insurance to "decommissioning" based on a reduction in premiums which would not have existed at all had the Government not breached; the Government is employing the financial burden caused by its breach as a factual basis to argue against Dairyland's recovery. Moreover, as noted above, Dairyland's nuclear license and insurance corresponded to the SNF and radioactivity on site – in other words, Dairyland's insurance premiums fluctuated based on circumstances distinct from decommissioning activities. *See* Tr. 577, 1035-36 (Wills).

Third, the Government proposes linkage between Dairyland's insurance and decommissioning through a 1984 premium insurance estimate document. DX 2. Mr. Maret explained in short that "if you look . . . to where . . . decommissioning [begins] . . . the premium goes up *substantially* because of the incremental risk associated with doing decontamination and dismantlement" (emphasis added). Tr. 716 (Maret). In other words, according to Mr. Maret, because of inflated risks associated with such work, "the risk is higher and the insurance premiums . . . reflect that kind of risk." *Id.* However, the pattern described by Mr. Maret does not appear present in this case because Dairyland's premiums did not "substantially" increase during 2013-18 – they remained roughly constant from 2013-17 and then dropped substantially in 2018. *See* PX 493 at 36; *see also* Tr. 1035-37 (Wills). Therefore, the 1984 premium estimate projection cannot be accepted as evidence tying Dairyland's insurance to "decommissioning."

In light of this, the Court finds that the evidence presented demonstrates that Dairyland's insurance costs are not "decommissioning" costs. As such, Dairyland is entitled to its insurance costs in the amount of $1,652,398.

## D. Site Security Deductions

Dairyland claims as damages the costs of site security incurred from 2013-18. The Government responds with deductions spanning many different claims categories including P30501 and P30632, the ISFSI/P10170, and indirect costs. The Court addresses these site security deductions collectively.

Dairyland witness testimony highlights the ties between Dairyland's NRC license and the NRC's regulatory role vis-à-vis Dairyland's site security plans. Witnesses testified that NRC regulations mandate security in conjunction with the NRC license, and that this applied to LACBWR. Tr. 189 (Olson). The scope of Dairyland's NRC license spanned the entire Genoa site, and the security plan was "reviewed and approved by the [NRC] . . . includ[ing] a presence at the front gate." Tr. 67 (Peters), 280 (Palmberg), 326 (Stubbendick). Under the security plan, Dairyland is required to have a minimum of security officers on site "24/7." Tr. 184 (Olson). "Most of the officers spend most of their time in the ISFSI Admin building, but they sometimes patrol, and an officer is stationed at the front gate." Tr 185 (Olson). The front gate officer is part of the required minimum. Tr. 185-86 (Olson). Dairyland does not maintain security at its other plant locations, which are not nuclear facilities. Tr. 79-80 (Peters), 279-80 (Palmberg).

Dairyland narrows the Court's focus by pointing out (A) that Mr. Maret, the "government's technical expert . . . did not address the site security issue," and (B) that Mr. Peterson stated at trial that he claims no technical expertise with respect to nuclear site security. Tr. 979-80. Therefore, the Government's non-accounting representations at trial concerning these deductions necessarily reflect the testimony of Dairyland's witnesses.

The Government alleges that Dairyland is claiming site security costs relating to the securing of non-nuclear assets. Government's ECF No. 126 at 19-20; *see also* Tr. 875 (Peterson arguing for deductions). The Government discovered a statement by Mr. Palmberg in an email: "I think we have a fabulous argument that but for LACBWR we wouldn't have a security guard at the front gate . . . and this allows us to recover the two-thirds in our next NWPA rounds." Tr. 323 (Palmberg). However, both Mr. Palmberg and Mr. Peters testified that *no* security would have been necessary but-for the SNF, and that Dairyland has no security at its other (non-nuclear) locations. Tr. 79-80 (Peters), 279-80 (Palmberg).

The Government makes another argument purporting to subdivide the LACBWR site into North and South, challenging "costs that were incurred for reasons other than the presence of fuel" (based in part on the location of the ISFSI). *See* ECF No. 132 at 6. But the trial record establishes that the NRC license covered the entire Genoa site, and that the NRC approved the security plan. *See* Tr. 167-68 (Olson).

Given the uncontested regulatory relationship between the NRC and Dairyland, and the NRC's supervision and approval of (A) the geographic scope of Dairyland's nuclear license and (B) Dairyland's security plan for that license, the Court rejects the Government's proposed $3,519,424 in "site security" deductions (excluding indirect cost deductions, which are addressed below).

### E.  Indirect Costs

Dairyland claims as damages its "Indirect Costs," which include both (1) LACBWR overhead costs and (2) General and Administrative ("G&A") costs. The parties do not dispute Dairyland's claimed overhead costs, which, as a matter of accounting, are readily traceable to specific segments of Dairyland's business. Tr. 528-29 (Wills). The parties do dispute G&A costs, which are by nature more difficult to ascribe to specific activities. *Id.* In any case, it is

14

undisputed that *some* proportion of Dairyland's Round 3 administrative costs related to activities which would not have been necessary but-for the Government's breach, i.e., LACBWR operations and the ISFSI.

G&A costs cannot be practically sorted into categories representing (A) administrative labor necessary because of the Government's breach (appropriately claimed as damages), and (B) administrative labor unrelated to the Government's breach (not claimed as damages). Because such G&A cost sorting is not possible, the parties agree on instead calculating the subset of G&A costs incurred because of the Government's breach as a "rate."  The fraction of administrative work necessary because of the Government's breach is thus determined based on the proportion of (A) total Dairyland expenditures necessary because of the Government's breach as a fraction of (B) Dairyland's total gross expenditures generally:

$$\frac{\text{Gross Dairyland Costs related to LACBWR/ISFSI}}{\text{Gross Dairyland Costs generally}} = \text{G\&A rate}$$

Dairyland's total gross expenditures generally are approximately $450 million per year.  *See* PX 493 at 63 (Wills).  Thus, the Government effectively argues that the denominator should be approximately $450 million.  Dairyland makes the case that the denominator for this calculation should instead be approximately $250 million.  *Id.*

The issue in dispute is whether Dairyland's Fuel and Purchased Power ("FPP") expenditures should be included in the rate calculation (in the denominator above) determining Dairyland's G&A costs.  FPP represents power that Dairyland literally "purchases," i.e., the power is generated independently of Dairyland's plants and then delivered to customers.  As of 2018, FPP represented a $200 million annual expense – approximately 45% of Dairyland's gross expenditures as a company.  *See* Tr. 402 (Stubbendick), 487 (Wehling); *see also* PX 493 at 63. The resulting G&A rate rises if FPP is excluded ($250 million denominator) and falls if FPP is included ($450 million denominator).

Dairyland claims its G&A costs with FPP excluded, so that the denominator is approximately $250 million, yielding a higher rate and thus higher G&A costs than if FPP was included.  *See generally* ECF No. 125 at 39-42; ECF No. 131 at 6-7; *see also* PX 493 at 63.  The Government proposes an $828,307 deduction, contending that FPP should be included, yielding a lower rate and lower G&A costs (damages).  *See generally* ECF No. 126 at 22-23; ECF No. 132 at 19-20.

Dairyland argues for the exclusion of FPP because, purportedly, including FPP represents an inaccurate, "distort[ed]" measure of Dairyland's actual administrative efforts because FPP requires almost zero administrative work.  *See, e.g.,* Tr. 593-94, 636 (Wills).  In other words, Dairyland represents that if one expresses Dairyland's administrative work in terms of Dairyland's expenditures, Dairyland's actual administrative work in practice reflects the 55% of expenditures (approximately $250 million) independent of FPP (the remaining 45% – approximately $200 million).  *See* PX 493 at 63.  Thus, focusing on this 55% of Dairyland expenditures requiring administrative work, Dairyland argues that its rate of administrative work on LACBWR and the ISFSI must be represented as a subset of this 55%.

Dairyland witnesses testified that FPP expenditures are in fact close to a "pass-through" cost or a "direct charge" to the company, and that FPP administration is merely a "matter of paying monthly invoices," where paying a $25 million invoice requires no more attention than a $100 invoice. *See* Tr. 439 (Stubbendick), 487-88 (Wehling). Thus, Dairyland contends, because FPP represents a $200 million cost requiring very little (if any) administration, including FPP in the G&A ratio cost calculation is a "distortion," misleadingly de-emphasizing LACBWR and ISFSI G&A efforts (which are significant, unlike FPP) as a proportion of overall G&A costs. *See* Tr. 439 (Stubbendick); Tr. 487-88 (Wehling); Tr. 593-94, 636 (Wills). Accordingly, Dairyland excludes FPP from its G&A cost calculation and contends that this exclusion accurately captures the administrative costs of LACBWR and the ISFSI as a subset of Dairyland's administrative work in general.[19]

The Government's post-trial brief arguments against Dairyland's rate calculations do not add very much. The Government's brief cites to trial testimony where Mr. Peterson mathematically distinguished G&A rate calculations with FPP included versus excluded. *See* ECF No. 126 at 22-23. The Government also observes that the FPP expenditures are enormous, and thereby suggests that it would be abnormal that this not trigger administrative labor. *Id.* But this does not rebut Dairyland witness testimony[20] indicating that FPP is close to a "pass through" cost or "direct charge." *See* Tr. at 487-88 (Wehling). The Government also challenges the exclusion of FPP on the basis that no such exclusion was made in calculating Dairyland's G&A costs in Rounds 1 and 2. *See* ECF No. 126 at 2, 10. However, this is seemingly explained by the fact that over this period Dairyland has been shutting down its own plants and increasingly purchasing power rather than generating it. *See* Tr. 271-73 (Palmberg), 590 (Wills).

The Court finds that the evidence presented supports Dairyland's claimed G&A costs, excluding FPP, and rejects the Government's proposed $828,307 deduction. The Court awards Dairyland its claimed indirect costs in the amount of $2,189,703.[21]

---

[19] Dairyland also further supports their position by demonstrating that the exclusion of FPP reflects the ratio of their G&A costs as allocated towards the two legs of the Dairyland business – Power Generation (PG) and Power Distribution (PD). If FPP is excluded, this reflects a ratio of 60-40, PG-to-PD (matching the two respective components of Dairyland's business). *See* PX 493 at 63; *see also* Tr. 591 (Wills). If FPP is included in the G&A rate calculation, this projects an PG-PD ratio of 85-15, which is erroneous. *Id.*

[20] A. After the contract is secured, it's a matter of paying monthly invoices, and that process is -- it's no different to really pay a large invoice for . . . 25 million dollars versus a supplies invoice for $100.
Q. . . . to what extent is there a difference between the amount of effort that would go into a fuel invoice versus . . . an invoice that LACBWR might deal with?
A. Very little. Tr. 487-88 (Wehling).

[21] The Government also proposes an additional $729,873 of "indirect costs" deductions – these are apparently deductions underlying the Government's proposed direct deductions related to LACBWR, the ISFSI, the SERP, Insurance, and the NRC Investigation. The Court finds that the Government has not introduced or presented sufficient evidence to enable the Court to even

**F. NRC Investigation Deductions**

In 2013, the NRC investigated Dairyland's financial representations concerning its Nuclear Decommissioning Trust (NDT) – the investigation found no misconduct by Dairyland.

This Court has already ruled that applying the $40 million NDT offset to decommissioning activities, the Government cannot dispute the finding that decommissioning would have concluded by 2005. *See* ECF No. 108. Despite this, Government takes the position that "even if it is true that Dairyland would not have maintained the NDT after 2005 if DOE performed, the whistleblower investigation is related to the trust." ECF No. 126 at 25. Therefore, purportedly, this is a "decommissioning cost" which should be subject to remaining funds in the NDT rather than awarded as damages. *Id.* In effect, the Government argues that for damages purposes, the fact the NRC investigation related to NDT filings supersedes the Court's finding that but-for the Government's breach, Dairyland would have been out of the nuclear business by 2005.

The Court disagrees. But-for the Government's breach, there would have been no NRC investigation in 2014. The Government's proposed "NRC Investigation" deduction of $30,426 is rejected, and these costs are awarded to Dairyland as damages.

**G. Claim Support Deficiency Deductions**

The Government proposes approximately $451,457 in deductions based on alleged "claim support deficiencies" in Dairyland's claimed damages – $307,916 attributed by Dairyland to ISFSI/P10170 costs and $143,541 attributed to LACBWR. The major line item in contention is "Express Employment." Express Employment is an employment agency through which Dairyland hired outside labor. *See* Tr. 953 (Peterson). These expenses corresponded to both the ISFSI and LACBWR operations and comprised "around 60 percent or so" of the Government's proposed "Claim Support Deficiency" deductions. Tr. 993 (Peterson).

The Government does not challenge any of these costs fundamentally but moves to deduct them from Dairyland's claimed damages in any case. ECF No. 132 at 19. First, the Government argues that Dairyland has not met its burden with respect to providing information to justify recovery. ECF No. 126 at 26; ECF No. 132 at 18. Second and related, the Government implies that if more were known about these costs, their "decommissioning" purpose could be established, foreclosing recovery. *Id.*

The Court declines to accept the Government's proposed "claim support deficiency" deductions for three reasons. First, as noted throughout this opinion, this Court issued a finding that but-for the Government's breach, decommissioning would have concluded as of 2005. *See* ECF No. 108. This Round of litigation concerns 2013-18. The "claim support deficiency" deductions are deductions from Dairyland's claimed costs relating to the ISFSI/P10170 and

---

begin to assess these indirect-direct deductions, and therefore rejects the Government's proposed additional $729,873 in "indirect costs" deductions outside of the FPP issue.

SAFSTOR/LACBWR operations. But-for the Government's breach, the ISFSI/P10170 would not have been necessary, and the LACBWR facility would have been fully decommissioned. *See* ECF No. 108.

Second, because this Court declines to find that LACBWR's "SAFSTOR" operational status triggers a "decommissioning" inference, SAFSTOR status itself likewise does not provide support for the Government's proposed LACBWR claim support deficiency deductions.

Third, the Government compiled these alleged "claim support deficiency" deductions based on the position that for Dairyland to recover, they must produce an invoice plus either a contract or a purchase order for claimed costs. Tr. 903 (Peterson). Dairyland's cross-examination of Mr. Peterson focused on his requirement of either a contract or a purchase order. *See* Tr. 988-89, 992 (Peterson). When prompted, Mr. Peterson did not provide any evidence or treatise to support his suggested standard, but stated that he or the Government would subsequently provide supportive caselaw to this effect. *Id.*

The Court finds that Dairyland thoroughly repudiated the Government's suggested standard for documentation to verify costs both with (A) its cross-examination of Mr. Peterson at trial, and (B) the caselaw presented in the parties' respective post-trial briefs.

At trial, Mr. Peterson admitted that there is no GAAP principle or anything in the federal acquisition regulations that support the Government's suggested standard for documenting costs. *See* Tr. 991 (Peterson). Mr. Peterson stated that he recognized that not all transactions have contracts and purchase orders. Tr. 992 (Peterson). Mr. Peterson also acknowledged that labor transactions do not have invoices, and that Express Employment expenses – reflecting the majority of the Government's proposed claim support deficiency deductions – are labor expenses. Tr. 953 (Peterson). Ms. Wehling testified that Dairyland's purchasing department determined that no external purchase order was required for costs related to Express Employment. Tr. 483-86 (Wehling).

In addition, Dairyland's accounting system appears robust and diligent,[22] and the Court finds that Dairyland has shown enough to establish that they have adhered to customary business standards for documentation of their costs. Mr. Peterson admitted that he heard Mr. Stubbendick's testimony regarding the reliability of Dairyland's accounting system and had no reason to dispute it. Tr. 988 (Peterson).

As noted above, the Government (Mr. Peterson) was unable to cite caselaw at trial supporting his position that Dairyland must produce an invoice plus either a contract or a purchase order for each claimed cost to recover. *See* Tr. 903, 988-92 (Peterson). This set the stage for legal arguments in the parties' briefs. The caselaw cited respectively by Dairyland *and* the Government come down on the side of Dairyland.

Dairyland cites *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1357 (Fed. Cir. 2001), which holds that documents prepared in the ordinary course of business are sufficient

---

[22] *See* ECF No. 125, *supra* note 13, at 25.

to establish and recover damages, even without a full explanation of the costs reviewed in the document by the sponsoring witness. The Court finds that Dairyland's accounting practices reflected the ordinary course of business.

The Government cites the "rules" section of *Entergy Nuclear Indian Point 2, LLC v. United States*, 128 Fed. Cl. 526, 535 (2016) (citing *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed Cir. 2005)) rather than its holding. *See* ECF No. 132 at 19. In other words, *Entergy* as cited (loosely) by the Government stands for the general proposition that with respect to demonstrating damages with reasonable certainty, "Damages do not need to be calculated with 'absolute exactness or mathematical precision' but may not be purely speculative." *Entergy Nuclear Indian Point 2*, 128 Fed. Cl. at 538 (citing *Indiana Mich. Power*, 422 F.3d at 1376).[23] The Court finds that Dairyland's claimed damages are reliable, not speculative; the caselaw cited by the two parties – namely *Bluebonnet* and *Entergy* – cuts in favor of rejecting the Government's proposed standard for verification of Dairyland's costs.

The Court finds that the Government's proposed $451,457 in "claim support deficiency" deductions must be rejected and awards these costs to Dairyland as damages.

## H. Special Early Retirement Program

Dairyland claims $2,238,483 in damages for the cost of offering LACBWR union employees a Special Early Retirement Program ("SERP").

Under the terms of Dairyland's agreement with the International Brotherhood of Electrical Workers union member employees at LACBWR were subject to a "bumping" provision: upon closure of the LACBWR plant, LACBWR union employees had the right to displace workers at another plant if they "reside within 60 miles."[24] JX 41.

---

[23] *Entergy* is a Spent Nuclear Fuel case, where the Government (Defendant) retained an expert witness, "Peterson," who reviewed the plaintiff's claimed costs and compiled a report supporting inferences that the plaintiff inadequately documented its damages. *Entergy Nuclear Indian Point 2, LLC v. United States*, 128 Fed. Cl. at 542. The Court found that "Peterson['s]" Report was not convincing and translated into a legal position erroneously requiring "absolute certainty" for cost documentation rather than the correct standard – "reasonable certainty." *Id.* at 547. The Court thereby rejected the Defendant's allegations of inadequate cost documentation. *Id.* at 538-39, 547. Furthermore, the court held that mere estimates corroborated by witness testimony (in lieu of documents destroyed in the ordinary course of business) satisfied the standard for reasonably certain documentation. *Id.* at 538-39. Also, specifically with respect to outside labor hired by the Plaintiff, the Court rejected arguments that the Plaintiff did not verify its costs because it did not provide a comprehensive record of invoices, or timesheets underlying the invoices. *Id.* at 547. In this case, the Dairyland costs which the Government alleges are insufficiently documented are concrete – not merely estimated – and the Government concedes they are concrete. ECF No. 132 at 19 ("... we are not challenging the fact that Dairyland incurred these costs, but rather their proper characterization.").

[24] The parties did not present evidence at trial about the residential addresses of the employees.

Dairyland represents that because their "flagship" plant, Madgett (which is non-nuclear), is located approximately 70 miles from LACBWR, the "bumping" provision threatened to "create havoc": LACBWR employees were near retirement age and not trained to operate Madgett. *See* ECF No. 126 at 20-21; Tr. 265, 267-68, 273 (Palmberg). Therefore, purportedly, to avert the problem of LACBWR union employees "bumping" Madgett employees, Dairyland offered LACBWR employees the SERP, paying them to retire slightly earlier than actual retirement age. Tr. 269 (Palmberg). In substance, the SERP was "a waiver on the penalties for [LACBWR union workers] for retiring before their original age 62 retirement plan," which could be regarded as "a stipend that allowed them to bridge the gap between when they left Dairyland's employ and when they could get Social Security and Medicaid benefits [upon reaching the necessary age]." *Id.*

Timing plays a significant role in Dairyland's argument for recovery of the SERP costs. Dairyland represents that if LACBWR had been fully decommissioned in 2005, Dairyland could have avoided the bumping complications which surfaced in 2014: in 2005, Dairyland could have transferred the LACBWR employees (including the two nuclear-specific employees) to other plants because (A) Dairyland had more power plants to which the employees could have been transferred and (B) the employees were younger at the time. *See* Tr. at 31 (Christians); 276-77, 305 (Palmberg). To support this analysis, Dairyland represents that in 2005 it was still generating most of its power directly, whereas by 2018, many plants had been closed, and 45% of the power delivered by Dairyland was being purchased rather than generated. *See, e.g.*, Tr. 271-73 (Palmberg), 441, 498 (Stubbendick). Second, Dairyland also represents that the technical differences between LACBWR and Madgett are such that training as an operator at Madgett takes four years, and further years beyond this for an operator to become comfortable – this misaligned with the ages and training of the LACBWR workers. Tr. 267-68 (Palmberg).

This Court has already ruled that but-for the Government's breach, LACBWR would have been decommissioned by 2005. *See* ECF No. 108. Also, as recognized in Round 1 of this case, "the non-breaching party need not demonstrate that a particular means of responding to the breach was foreseeable." *See, e.g.*, *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1321 (Fed. Cir. 2007) (citing Joseph M. Perillo, 11 Corbin on Contracts Sec. 56.7 at 108 ("What is required is merely that the injury actually suffered must be one of a kind that the defendant had reason to foresee and of an amount that is not beyond the bounds of reasonable prediction.")); *see also Southern Nuclear Operating Co. v. United States,* 77 Fed. Cl. 396, 405 (2007) ("While the general response to a breach must be foreseen, the particular way that a mitigating decision is implemented need not."). Federal regulations establish staffing requirements for nuclear power plants, including if they are not actively generating power. *See, e.g.*, 10 C.F.R. 50.54(m)(2). Thus, if Dairyland demonstrates that its LACBWR delayed-decommissioning staffing complications were foreseeable – as distinguished from the foreseeability of the SERP costs – this satisfies the standard for foreseeability.

The Government makes three arguments against awarding the costs of the SERP to Dairyland – in all three instances, the Government disputes Dairyland's alleged links between the Government's breach and the staffing complications purportedly justifying the SERP. First, the Government argues that the SERP was discretionary: Mr. Palmberg, a Dairyland executive involved in the decision to issue the SERP, testified that the decision reflected Dairyland's "long

history of acting as a responsible employer to its workforce," and intent to "minimize disruption to those worker[s] and their families." Tr. 278 (Palmberg). This would help "enable [Dairyland] to attract and maintain a workforce with the requisite expertise in the face of retirements and the tight job market for such workers." *Id.; see also* ECF No. 126 at 20-21. This point, however valid, does not supersede the representations that under the union agreement, Dairyland faced "bumping" complications with respect to LACBWR employees.

Second, in its reply brief, the Government raises an issue about geography: under the terms of the union agreement, "bumping" applies only to employees who "reside within 60 miles of the unit," but the distance between LACBWR and Madgett is approximately 70 miles. ECF No. 132 at 8 (citing JX 41 at 3); Tr. 293 (Palmberg). However, at trial, the Government did not raise an argument about the residences of the employees (i.e., the distance between their residences and the Madgett plant), nor did evidence at trial include such residential information. Therefore, this argument is precluded.

Third, the Government argues that Dairyland's claimed SERP costs must be offset by the equivalent amount of severance compensation which would have been paid to LACBWR employees not absorbed into other Dairyland operations had decommissioning transpired in 2005. *See, e.g.,* ECF No. 126 at 21. However, at trial, LACBWR witnesses testified that LACBWR employees could have been transferred to other plants if LACBWR had been fully decommissioned in 2005, avoiding "bumping" complications. *See* Tr. at 31 (Christians); 276-77, 305 (Palmberg). Accordingly, Dairyland contends that they "would not have incurred severance costs in the nonbreach world because if LACBWR had de-staffed at that time, Dairyland would have been able to have placed the former LACBWR employees elsewhere in the organization, resulting in no severance, thus no severance costs." ECF No. 125 at 13; ECF No. 131 at 5. The Court agrees with Dairyland.

The Court finds that the evidence presented demonstrates that complications related to continued staffing of LACBWR while decommissioning was delayed were foreseeable at the time of the Government's breach. The Court awards all the SERP costs to Dairyland in the amount of $2,238,483.

### III.    Conclusion

For the reasons set forth above, the Court deducts $2,218,863.16 in decommissioning costs. The Court awards Dairyland damages in the amount of $23,153,322.84. The Clerk is directed to enter judgment accordingly.

The parties are directed to file redactions within seven (7) days of the date of this Opinion and Order.

**IT IS SO ORDERED.**

s/Edward J. Damich
EDWARD J. DAMICH
Senior Judge
